IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HEIL TRAILER INTERNATIONAL, CO., a Delaware Company, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | NO. 4:12-CV-00385 |
| vs. | ) | |
| | ) | |
| GAVIN KULA, a Texas citizen, JERRY DAVIS, a Texas citizen, ROBERT TROXELL, a Texas citizen, WILLIAM LYMAN, a Texas citizen, and TROXELL COMPANY, INC., a Texas corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX IN SUPPORT OF HEIL TRAILER INTERNATIONAL CO.'S
APPLICATION FOREMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTIVE RELIEF AND BRIEF IN SUPPORT**

Terrence J. Sheahan *(pro hac vice motion pending)*
James W. Witz *(pro hac vice motion pending)*
Michael S. Mayer *(pro hac vice motion pending)*
FREEBORN & PETERS LLP
311 South Wacker, Suite 3000
Chicago, Illinois 60606
Ph: (312) 360-6000
Fax: (312) 360-6575

-and-

Jeremy W. Hawpe
State Bar No. 24046041
LITTLER MENDELSON, P.C.
2001 Ross Avenue, Suite 1500
Dallas, Texas 75201
Ph:  (214) 880-8100
Fax: (214) 880-0181

**ATTORNEYS FOR PLAINTIFF**

In support of its motion for temporary restraining order and preliminary injunctive relief,

Plaintiff, Heil Trailer International, Co. ("Heil"), states the following Appendix of evidence:

| | |
|---|---|
| Affidavit of Jim Sanko | APP 001-APP 010 |
| Declaration of Ray Hudgins | APP 011-APP 015 |
| Affidavit of Bryan Yielding | APP 016-APP 024 |

Dated: June 11, 2012                    Respectfully submitted,

By:/s/ Jeremy W. Hawpe

Terrence J. Sheahan *(pro hac vice motion pending)*
James W. Witz *(pro hac vice motion pending)*
Michael S. Mayer *(pro hac vice motion pending)*
FREEBORN & PETERS LLP
311 South Wacker, Suite 3000
Chicago, Illinois 60606
Ph: (312) 360-6000
Fax: (312) 360-6575

-and-

Jeremy W. Hawpe
State Bar No. 24046041
LITTLER MENDELSON, P.C.
2001 Ross Avenue, Suite 1500
Dallas, Texas 75201
Ph: (214) 880-8100
Fax: (214) 880-0181

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served along with Plaintiff's Complaint via process server to the following:

Troxell Company Inc.
c/o Mr. Robert Troxell
5940 E. Hwy. 114
Rhome, TX 76078

Mr. Robert Troxell
Troxell Company Inc.
5940 E. Hwy. 114
Rhome, TX 76078

Gavin Kula
124 Carnes Court
Springtown, TX 76082

Jerry Davis
5436 Canyon Lands Dr.
Ft Worth, TX   76137

Willliam Lyman
7105 Oak Park Drive
Richland Hills, TX 76118

/s/ Jeremy W. Hawpe

Firmwide:112310087.1 071724.1001

## AFFIDAVIT OF JIM SANKO

| | | |
|---|---|---|
| STATE OF TENNESSEE | ) | |
| | ) | SS |
| COUNTY OF BRADLEY | ) | |

Before me, the undersigned notary public, Jim Sanko, being by me first duly sworn, deposes and says as follows:

1.      My name is Jim Sanko. I am an over the age of 21 and a resident of the State of Tennessee. I have personal knowledge of all of the facts set forth herein.

2.      I am currently employed at Heil Trailer International, Co. ("Heil") and have been employed there since 1995. I work at Heil's Cleveland, Tennessee location, which is also its corporate headquarters and principal place of business.

3.      I serve as the Chief Financial Officer for Heil and have served in that position since 2004.

4.      Heil Trailer International, Co. is a Delaware company with its principal place of business at 1850 Executive Park Drive NW in Cleveland, Tennessee.

5.      Heil has been designing, developing, and manufacturing transportation equipment since 1901. It is a global manufacturer of specialty transport trailers and is a leader in that industry. Heil's product line includes liquid, dry bulk, oilfield, construction, platform, towing, and military defense trailers.

6.      Heil has decades of experience in the design and manufacture of aluminum tank trailers used for liquid transport, including petroleum, crude oil, hot products, and water products. It has a facility in Rhome, Texas that employs over 200 people. At that facility, among others, Heil engineers design Heil products and have access to Heil's engineering

**APP 001**

computer servers that store Heil proprietary trade secret information, including engineering information for the design and manufacture of its trailers.

7.     Heil's products are designed by engineers.  Heil does not build 'cookie-cutter,' one-size-fits-all liquid trailers.  Instead, Heil's engineering group utilizes state-of-the-art design and analysis tools, decides on a number of different factors during the design of the trailers, and spends years perfecting designs for each trailer model in order to ensure maximized performance and efficiency for the function required.  Heil specially designs and manufactures its liquid trailers to be able to sustain very rough terrain and achieve maximum efficiency, while reducing weight and ensuring safety.

8.     Not surprisingly, designing each model of liquid trailer therefore requires Heil to expend a significant amount of cost, resources, and time.  In designing and developing its trailers, Heil has both purchased intellectual property and developed intellectual property through years of research and development.  Heil employs skilled engineers at a high employment cost, as well as very expensive engineering equipment (including engineering computer programs) for those engineers to utilize in designing its trailers.

9.     This is because, while there are many ways to design and put together a liquid trailer, the methodology designed by Heil's engineers for creating and manufacturing its trailers is what makes Heil's products valuable to the user and, thus, to the success of its business.

10.    Heil's liquid trailers are known in the industry to be top-tier trailers because of that methodology.  It is what allows Heil to make light liquid trailers that are both safe and functional and that customers readily seek out to purchase.

11.    However, if Heil's confidential trade secret information were to be acquired by a competitor, Heil would be put at an unfair competitive disadvantage and would face severe

**APP 002**

damage to its business operations.  For instance, obtaining engineering plans for even one of the liquid trailer models would allow a competitor to target specific customers with a virtually identical product.

12.    As described below, that is one reason why Heil diligently protects and safeguards its own trade secrets, business interests, and confidences.

13.    Heil takes varied and extensive security measures in order to protect its trade secret information.

14.    For example, at Heil's Rhome, Texas facility (the site of the theft at issue), there are locks on the outside doors and employees must have their identification cards, which are embedded with computer chips, in order to gain access to the facility.  Additionally, all employees are provided with a specific user identification name and password for logging on to Heil computers at the facility.  Those passwords are required to be changed periodically.

15.    Heil's employees are provided access to different trade secret information depending on that employee's position.  Due to their job requirements, engineers are provided with more extensive access privilege, including computer access to Heil's engineering drawings/plans for its trailers.

16.    Furthermore, for years, Heil's engineers, including Gavin Kula ("Kula") and Jerry Davis ("Davis"), have been required to specifically agree to a code of business ethics ("Business Code"), an information technology user access policy ("IT Policy"), and a remote access policy ("Remote Access Policy").

17.    Heil utilizes the Business Code, IT Policy, and Remote Access Policy, among other things, to remind employees of their obligations to safeguard Heil's business interests and confidences (including trade secret information), and mandates those obligations.

APP 003

18.   The Business Code subjects Heil's employees to strict guidelines prohibiting the improper use and disclosure of confidential information.  (*See* A True and Accurate copy of the Business Code, attached to the Complaint as Exhibit A)[1]

19.   For instance, the Business Code specifically notes that Heil employees have access to confidential company information and charges Heil employees with the responsibility to keep such information confidential:

**Protection and Proper Use of [Heil] Property**

Every employee must safeguard [Heil] property from loss or theft, and may not take such property for personal use.   [Heil] property includes confidential information, software, computers, office equipment, and supplies.   You must appropriately secure all [Heil] property within your control to prevent its unauthorized use.

...

[Heil] and third-party software may not be copied, distributed or disclosed without specific authorization.

...

**Confidentiality and Proper Use of [Heil], Customer or Supplier Information**

You may not use or reveal to others [Heil], customer or supplier confidential or proprietary information, except as authorized by your senior management or as legally required.   This includes business methods, pricing and marketing data, strategy, computer code, screens, forms, experimental research, and information about [Heil's] current, former and prospective customers and employees.

20.   The Business Code also informs the employees that they must avoid even the appearance of a conflict of interest, that "there is a likely conflict of interest if you...compete, or prepare to compete, with [Heil] while still employed by [Heil]," and that they "may not exploit [their] position or relationship with [Heil] for personal gain."

---

[1] At the time of issuance, Heil was a wholly owned subsidiary of Dover Corporation, which is why the Business Code attached to this Complaint references Dover instead of Heil specifically.

**APP 004**

21.     The Business Code adds that: "In addition to avoiding conflicts of interest, you must not take for yourself or divert to others any business opportunity or idea discovered in the course of employment in which [Heil] might have an interest."

22.     Heil requires its employees to agree to the Business Code.  Kula and Davis both expressly agreed electronically to the Business Code.

23.     The IT Policy similarly subjects Heil's employees to strict guidelines regarding use of Heil property and ownership of that property.  (*See* A True and Accurate copy of the IT Policy, attached to the Complaint as Exhibit B).

24.     For instance, the IT Policy includes a provision stating that all of the electronic programs and information Heil's engineers use or develop while employed at Heil are Heil's property:

**Product Ownership**
Any software program, text, graphical material, or data you develop at the direction of Heil Trailer International management as part of your job is the property of Heil Trailer International even if the development occurs after business hours.  This proprietary material may not be used to benefit any individual employee or outside organization without first obtaining written permission of Heil Trailer International management.

25.     Both the IT Policy and the Remote Access Policy set forth security requirements and measures for protecting Heil's electronic confidential and trade secret information.  (*See* Exhibit B; A True and Accurate copy of the Remote Access Policy, attached to the Complaint as Exhibit C)

26.     Heil requires its employees to agree to and sign both the IT Policy and the Remote Access Policy.  Kula and Davis both agreed to and signed the IT Policy and the Remote Access Policy.  (*See, e.g.,* True and Accurate copies of Signature Pages, attached to the Complaint as Exhibit D).

**APP 005**

27.     Thus, the Business Code, IT Policy, and Remote Access Policy expressly contemplate that Heil's engineers, including Kula and Davis, will obtain confidential and trade secret information as part of their employment regarding, among other things, Heil's engineering plans, and will be required to take measures to keep that information confidential.  They also contemplate that such confidential and trade secret information belongs to Heil.

28.     These three specifically agreed-to codes and policies complement additional codes and policies that Heil's employees are made aware of and subject to.

29.     Both Kula and Davis are former Heil employees (specifically, Senior Design Engineers) who worked in the engineering group at Heil's facility in Rhome, Texas.

30.     Kula worked for Heil for approximately 9 years.

31.     Davis worked for Heil for approximately 12 years.

32.     Both Kula and Davis worked on designs for liquid trailers as well as other trailers.

33.     Heil provided Kula and Davis with considerable compensation and benefits for their work, and Heil invested substantial resources in both training and employing Kula and Davis.

34.     As mentioned above, Kula and Davis both signed and/or expressly agreed electronically to the Business Code, the IT Policy, and the Remote Access Policy.  (*See, e.g.,* Exhibit A at pp. 5, 10; Exhibit D)

35.     Additionally, throughout the time that they were employed at Heil, both Kula and Davis were aware that any Heil employee who, either in the past, currently, or in the future, confiscated or transferred Heil's business or proprietary information to any third party or to Heil's disadvantage would be subject to discipline, termination, and/or prosecution under the law.

**APP 006**

36.     Kula and Davis even took a "Recognizing Conflicts of Interest" course and received completion certificates for that course.   (*See* A True and Accurate copy of the Completion Certificates, attached to the Complaint as Exhibit E)

37.     And, on March 30, 2011, both Kula and Davis participated in a one hour Heil Intellectual Property Training Course in which they were reminded once again that Heil protects its intellectual property and that they were obligated not to disclose that information outside of Heil.   In fact, both Kula and Davis were required to sign, and did sign, an attendance log verifying that they attended that Training Course.   (*See* A True and Accurate copy of the Training Meeting Attendance Log, attached hereto as Exhibit F).

38.     As Senior Design Engineers and trusted employees, and subject to agreeing to Heil's confidentiality obligations, both Kula and Davis were given access to Heil's confidential and trade secret information, including access to Heil's engineering server where it housed the drawings/plans for its trailers.

39.     Troxell Company, Inc., ("Troxell") is located less than five miles from Heil's facility in Rhome, Texas.

40.     Troxell is one of Heil's main competitors and has been involved in the trailer manufacturing business for a number of years.

41.     William Lyman ("Lyman"), a supervisor at Troxell, is a former Heil employee. In approximately August 2011, Lyman abruptly left Heil disgruntled and started working for Troxell, Heil's competitor.

42.     In or about December, 2011, Kula informed Heil of a medical condition and/or procedure that would cause him to be unable to work.   Kula provided notice of—and took—leave under the FMLA.   Kula was on leave from Heil under FMLA from December 12, 2011

through approximately March 12, 2012, at which time he began utilizing his accrued vacation until his resignation on or about April 10, 2012.

43.   The FMLA and Heil required Kula to submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to his own serious health condition.

44.   Kula had his healthcare provider give the medical certification.  That healthcare provider indicated that Kula was unable to perform any of his job functions due to his condition. That healthcare provider also indicated that Kula would be incapacitated for a single continuous period of time due to his medical condition, including time for treatment and recovery, which he estimated to be approximately several weeks.   During the FMLA leave, Kula's healthcare provider also provided a Work Release for Kula, which stated that Kula was not released to work of any nature.

45.   At least by way of electronic mail on February 29, 2012, Kula himself communicated to Heil and reiterated his health care provider's statement that Kula was not released to work in any nature.

46.   While on FMLA leave, Kula continued to receive salaried compensation from Heil, but he secretly performed work for Troxell.

47.   Neither Kula nor Davis told Heil or received approval, authorization, or permission from anyone at Heil to provide confidential and trade secret information to Troxell.

48.   In or about February 2012, in a further attempt to protect its trade secrets, Heil sent its engineers a "Non-Compete Agreement, Confidentiality Agreement, and Continuing Employment Agreement" for them to review and execute.   That agreement contained a non-competition clause that Kula and Davis balked at and refused to agree to.

APP 008

49.     While employed by Heil, Davis had communications with third parties regarding the proposed non-competition agreement that Heil asked Davis to sign, his determination not to sign it, and his plans to leave Heil.

50.     After Kula and Davis refused to agree to the non-competition agreement, Davis voluntarily resigned his employment at Heil effective March 30, 2012 and Kula voluntarily resigned his employment without notice on or about April 10, 2012 (after Kula had returned from FMLA leave and then from his vacation time).

51.     At the time of their resignations and for time thereafter, Heil was unaware of any improper action by Kula or Davis.

52.     After resigning their employment at Heil, Kula and Davis began their official employment as engineers at Troxell.

53.     Troxell recently contacted personnel at Crystal Finishing Systems ("CFS") in Wisconsin.

54.     CFS is a component parts supplier for Heil.  CFS supplies what are known as aluminum extrusions that Heil uses in manufacturing its trailers.

55.     A CFS employee informed a Heil employee that Troxell had asked if CFS would sell aluminum extrusions to Troxell.  Heil is presently in the process of renegotiating its contract with CFS, and CFS would have the ability to do work for Troxell.

56.     Finally, on December 30, 2011, AIP/Heil Trailer Holdings, Inc. purchased Heil—including Heil's intellectual property—for over $200 million, which consisted of nearly $150 million for intangibles relating to Heil's customer relationships and goodwill.  Both Heil's customer relationships and goodwill have now been impaired by Defendants' actions.

APP 009

57.     Without preliminary and permanent injunctive relief, Heil will suffer further irreparable harm.


FURTHER AFFIANT SAYS NOT

_____
Jim Sanko

Subscribed and sworn to before me, this ___ day of _____, 2012.

_____
Notary Public

My commission expires:

_6-30-14_

2647064v2

10                                                                          **APP 010**

## DECLARATION OF RAY HUDGINS

1.      I, Ray Hudgins, am an over the age of 21 and a resident of the State of Texas. I have personal knowledge of all of the facts set forth herein.

2.      I am currently employed at Heil Trailer International, Co. ("Heil") in its Rhome, Texas facility. I have been employed there since April 2012. I serve as the Lean Team Consultant for Heil and have served in that position since April 2012.

3.      I was employed by Troxell Company, Inc. ("Troxell") in Rhome, Texas as a Purchasing Agent. I served in that position from approximately November 20, 2011 until April 2012 when I returned to my employment at Heil. During my employment at Troxell, I handled the stock room and orders in the purchasing department.

4.      I was previously employed by Heil's facility in Rhome, Texas from approximately November 20, 1995 until approximately November 20, 2011 (when I departed to work for Troxell) and served at that time as being in charge of inventory control of the stock room.

5.      From at least November 20, 2011 through early April 2012, Troxell did not officially employ any engineers.

6.      Starting at least in November 2011, Gavin Kula began performing work for Troxell while still employed by Heil, and he would also occasionally visit the Troxell facility while on lunch breaks from Heil.

7.      Kula performed the work at the behest of Robert Troxell, Troxell's owner and president and William "Sonny" Lyman, a supervisor at Troxell, and he worked with both of them for Troxell. Robert Troxell would also tell Troxell employees to have Kula work on various items for Troxell.

APP 011

8.     During the time that I worked at Troxell, I worked in and shared an office with Lyman.  That office was approximately eight feet by six feet and, on occasion, I saw items on Lyman's computer screen and witnessed meetings and conversations that Lyman had with, among others, Kula as well as Robert Troxell.

9.     I saw Kula present at the Troxell facility throughout my employment with Troxell.  I would see Kula physically present at the Troxell facility approximately one to two times each week.

10.     During those visits, among other things, Kula would program Troxell's equipment to cut aluminum for the three specific models.  Kula would also give Troxell employees various portions of the Liquid Trailer Plans in both paper and electronic form and assist those individuals in programming the machines to actually manufacture the trailers.

11.     Additionally, starting at least in November 2011, Heil's engineering drawings/prints for the barrel and frame for the three specific models at issue were present at the Troxell facility.

12.     I was intimately familiar with what Heil's engineering drawings/prints looked like due to my prior employment at Heil starting in approximately 1995 where, among other things, I worked in the stock room.  I saw these Heil engineering drawings/prints both on Troxell's production floor as well as in Troxell's fabricating department, and I knew them to be Heil's because they actually had the Heil logo and a Heil engineer's name on them.  In fact, I saw these Heil engineering drawings/prints—with a Heil logo on them—at the Troxell facility through March 2012.

13.     I also saw Heil's electronic design and manufacturing plans (including engineering drawings/prints) for the three specific models at Troxell's facility.  As one example,

in approximately mid-December 2011, I was in his office with Lyman and Kula and he saw copies of Heil's electronic design and manufacturing plans (including engineering drawings/prints) on Lyman's computer. I also saw hard copies of those types of Heil materials on desks in Troxell's design department.

14.    Troxell even has (or had) in its possession photographs of Heil's production lines so that Troxell can copy the way that Heil sets up its production lines. I saw these photographs on Lyman's computer.

15.    Kula informed me that Robert Troxell would pay Kula via personal check for Kula's work at Troxell while Kula was still employed by Heil. Kula informed me of this at the Troxell facility in the presence of Lyman.

16.    Also, Kula told me that that Robert Troxell provide him with computer equipment for Kula's home so that Kula could perform work for Troxell there (all while Kula was still employed by Heil and while Kula was taking FMLA leave).

17.    I saw emails on Lyman's computer from Kula that contained portions of the Liquid Trailer Plans.

18.    Kula also utilized a computer storage device to transfer at least portions of the Liquid Trailer Plans from computers at Heil's Rhome, Texas facility to Troxell's facility.

19.    For example, I saw Kula plug a thumb drive (electronic storage device) into a Troxell computer. That thumb drive contained an electronic version of the engineering barrel drawing designed by Heil engineer Rob Sitton for one of Heil's trailers. I saw that barrel drawing at Troxell in both hard copy and electronic form.

3

20.     Jerry Davis showed up at Troxell with his own thumb drive right after Troxell officially hired him and while I was still working for Troxell.  I believe that thumb drive contained Heil trade secret information.

21.     I saw Troxell employees utilizing the Liquid Trailer Plans.  Specifically, I saw Troxell employees utilizing Heil engineering drawings/prints to manufacture those three specific types of Heil aluminum liquid crude oil trailers as their own.

22.     By the time I stopped working for Troxell in April 2012, Troxell had increased its capabilities through the use of Heil's trade secrets such that Troxell was manufacturing approximately 7 to 8 of the three aluminum liquid crude oil trailer models each week.

23.     Troxell has now obtained and used Heil's trade secret information, including the Liquid Trailer Plans, to build and sell aluminum liquid crude oil trailers to various customers, including Big Star Trucking, LLC.

24.     While still employed by Heil, Kula, as a DCE, signed certifications on behalf of Troxell for certain of its 'code tanks.'

25.     I witnessed Kula signing certifications for Troxell's units while Kula was still employed by Heil.

26.     Starting at least in November 2011, it was an open secret at Troxell that Kula was performing work for Troxell while still employed by Heil.

27.     Troxell employees also know that what Troxell is doing is wrong.

28.     For example, in approximately December 2011, one of Troxell's salespersons, Mike Schofield, said at the Troxell facility and in the presence of me and another Troxell employee named Randy, that Troxell could get in trouble for having Heil's engineering drawings/prints in its possession.

APP 014

29.    Moreover, both Lyman and Kula admitted, in approximately December 2011 out on the Troxell shop floor and in the presence of me and another Troxell employee named Kenny Christian, that they could get in trouble for having the information that was taken from Heil.

I declare under penalty of perjury that the foregoing is true and correct.

Ray Hudgins

5                              **APP 015**

## AFFIDAVIT OF BRYAN YIELDING

STATE OF TENNESSEE      )
                               )    SS
COUNTY OF McMINN       )

Before me, the undersigned notary public, Bryan Yielding, being by me first duly sworn, deposes and says as follows:

1.    My name is Bryan Yielding. I am over the age of 21 and a resident of the State of Tennessee. I have personal knowledge of all of the facts set forth herein.

2.    I am currently employed at Heil Trailer International, Co. ("Heil") and have been employed there since approximately 2007. I work at Heil's Athens, Tennessee location.

3.    I currently serve as Heil's Vice President of Product Development. Since 2007, I also served in various positions at Heil, including as Director of Engineering and Product Management, Product Manager for Liquid Trailers, Director of Supply Chain, and Director of Research and Development.

4.    I also worked at Heil from approximately 1994 through approximately 2001. During that time I served in various positions at Heil, including chief engineer for dry bulk trailers, research and development for dry bulk trailers, and products specialist for dry bulk trailers.

5.    Companies in the liquid trailer business compete in designing and manufacturing the lightest trailer possible (so that more liquid can be transported in the trailer) while still being able to haul the liquid in a safe, reliable way over various terrain. In order to do so, Heil's engineers test and consider numerous variables—including geometry, production material, and

assembly methodology—in designing and creating each liquid trailer model. The liquid that will be hauled is also a variable that must be considered because each liquid has a different weight.

6.     Heil's electronic engineering proprietary and trade secret information is specially housed on its engineering servers. Heil has tiered security access to its engineering server. For example, an employee in the accounts payable/receivable department would not have computer access to Heil's engineering drawings/plans for its trailers.

7.     Heil's standard protocol strictly prohibits dissemination of any Heil drawings to third parties without the consent of senior engineering leadership, and even in such cases, such disclosure must further Heil's business interests. Instead, in order to market and sell its product to customers, it provides a simplified sketch known as a 'weight drawing' or 'approval drawings' (collectively "weight drawings") to give its customers an idea of what their trailer may look like or to indicate customer acceptance. However, a 'weight drawing' does not provide any information regarding the methodology or specifics—such as geometry, material composition, and assembly instruction—for the trailer.

8.     Moreover, even 'weight drawings' are secured, protected, and not publicly available. If a customer is given a 'weight drawing,' only he or she will receive a copy of that 'weight drawing' and that drawing will be of the customer's own specific proposed trailer, not another customer's trailer.

9.     In addition to the proprietary information, every one of Heil's drawings, even the 'weight drawings,' contains both a prominent Heil logo (that includes the word "Heil") as well as a notification of its confidentiality. The notification states:

> This print is the property of the HEIL Co. and is recallable at any time. It must not be copied or used detrimentally to the interest of the HEIL Co.

10.   Neither Gavin Kula ("Kula") nor Jerry Davis ("Davis") had worked on designing tank trailers before they came to Heil.

11.   While the full extent of what the Defendants have stolen from Heil is not currently known, at a minimum, Kula improperly obtained Heil's trade secret information for three specific models of aluminum liquid crude oil trailers (the "Liquid Trailer Plans") and provided them to Troxell while still employed by Heil.

12.   Aluminum liquid crude oil trailers account for approximately 20% of Heil's yearly production of all Heil products. Those three specific models of aluminum liquid crude oil trailers are the 'bread and butter' for Heil's liquid trailer business.

13.   The Liquid Trailer Plans include technical electronic computer-aided design (CAD) drawings and data for those three specific models, as well as technical drawings demonstrating how sheets of aluminum should be precisely cut and put together in order to create the barrel – which houses the crude oil – for those models. These technical drawings can then be used to generate electronic code (at least some of which Kula also took from Heil) to "tell" a machine to cut and otherwise fabricate sheets of aluminum to form the trailer's barrel and other portions of the supporting structures.

14.   The Liquid Trailer Plans are not simply an image or engineering drawing of the three specific models. Instead, for each, the Liquid Trailer Plans provide the engineering details for basically everything necessary to make that specific type of trailer, including its packaging, structure, materials used, the geometry used to form those materials, the way to weld those materials, and the design of the parts comprising the trailer. The Liquid Trailer Plans essentially comprise the entire methodology (in electronic form) for designing and manufacturing those three specific types of trailers.

**APP 018**

15.     Of course, Troxell is also able to print out hard-copy versions of any portion of the Liquid Trailer Plans that can be put into printable form and then hand those hard-copy versions to all of their employees and even third parties.

16.     As with all of its trade secret information, the Liquid Trailer Plans are not known outside of Heil's business, and only a subset of Heil's employees know or have access to the Liquid Trailer Plans.  As described above, Heil took extensive measures to guard the secrecy of the Liquid Trailer Plans.

17.     Due to their nature as the plans for three of Heil's liquid trailer models in its successful liquid trailer business line, the Liquid Trailer Plans are very valuable to Heil.  Heil expended a great deal of effort and money in developing the Liquid Trailer Plans, and it would be extremely difficult for them to be properly acquired or duplicated by others.   Heil has both purchased intellectual property and developed intellectual property through years of research and development in order to design the aluminum liquid crude oil trailers and create the Liquid Trailer Plans.

18.     Kula utilized electronic mail to transfer at least portions of the Liquid Trailer Plans to Troxell employees.

19.     For example, Kula sent from his own Heil email address emails transferring to Troxell employees Heil drawings relating to various portions of the trailers, calibration charts, 'weight drawings,' and electronic data files that are essentially software that enable Troxell to have the electronic drawings be "read" by the machines used to build the trailer and/or trailer parts.  He even sent, from his own Heil email address to Troxell employees, emails providing Heil internal operating procedures, Heil pricing and purchasing information for parts, and information relating to Heil customers.

**APP 019**

20.    Heil recovered some emails sent from Kula's Heil email account confirming this. The few emails recovered to date (and recovered only from Kula's own Heil email account) demonstrate Kula misappropriating a wide array of Heil proprietary, trade secret information. The following are a few examples of those emails. Each is an example demonstrating that Kula was sending valuable Heil trade secret information to Troxell employees by email, while employed by Heil and on FMLA leave.

### a.    Drawings

21.    On January 7, 2012, Kula sent to Lyman emails attaching electronic CAD drawings for the rear frame suspension frame layout, tank interface layout, rear subframe and related tank mounting areas. Heil used these drawings in manufacturing its trailers.

22.    On January 2, 2012, Kula sent an email to a third party and Lyman attaching weight distribution drawing that Kula admits in the body of the email is based upon information used for a particular Heil customer's units (with the Heil name and logo having been switched to a Troxell name and logo). Troxell could then use this drawing as a form for future Troxell customers.

### b.    Calibration Chart

23.    On January 7, 2012, Kula sent an email to Lyman attaching a Heil Calibration Chart for one of the three specific models. That calibration chart is unique to Heil's design and contains proprietary information. It also prominently displays the Heil logo, name, and address on each page. It even displays the specific Heil customer identification number for the customer who purchased the exact trailer for which the calibration chart corresponds. The email itself demonstrates that Kula was contacting Lyman because Troxell was having problems in manufacturing that model of Heil's trailer and the Heil Calibration Chart would be used to help

APP 020

solve that problem. These geometry-specific charts are uploaded into a device that determines the volume of the liquid in the vessel at any given height.

### c. Electronic data files

24. On February 14, 2012, Kula sent to Lyman and another Troxell employee a machine data file that assists in driving an engraver to make the calibration plate for one of the three models mentioned above and to allow liquid level sensors to function properly. This information is essentially an instruction for a piece of equipment to "read" in connection with an electronic drawing and then manufacture a portion of the trailer in accordance with that drawing.

### d. Heil pricing and purchasing information for parts

25. On January 21, 2012, Kula sent to Lyman a screen shot from Heil's internal Materials Requirements Planning ("MRP") system that set forth a description, production information, cost information, and purchasing information (including a unit price) for a specific trailer part. Heil used this information in making purchasing decisions for its parts.

### e. Internal Operating Procedures

26. In two emails on February 14, 2012, Kula sent to Lyman some Heil internal operating procedures relating to properly relieving/adjusting inventory for defective parts/materials. Heil used this information in troubleshooting problems that it would encounter in its operations.

27. Moreover, also while Kula was working for Heil and on FMLA leave, he directly copied Heil engineering drawings and converted them for Troxell to use in making the three specific models.

28. Information recovered by Heil from Kula's Heil email account shows that Kula used software, that either he or Troxell had purchased, to access Heil's engineering servers. He

then opened various files on that server containing Heil engineering drawings and manipulated those files to make a new version of the drawings that substituted the Heil name and logo with a Troxell name and logo.  In fact, some of the recovered emails from Kula's Heil account attach electronic engineering drawings where the underlying code in those drawing files confirm that they were, in fact, Heil's drawings despite now having the name 'Troxell' on them.  In making the new versions, Kula even adopted the Heil Rhome facility's unique numbering scheme for identifying drawings.  Thus, the information demonstrates that stolen Heil information would be used as foundation resources that were further manipulated and converted into Troxell materials.

29.     Davis likewise improperly obtained and provided Heil trade secret information to Troxell during his employment with Heil.

30.     For example, information recovered by Heil indicates that on February 9, 2012, while still working for Heil, in an email chain between Davis and a third party with the subject line "Re: Heil Flange," Davis received a copy from a third party of what purported to be a Troxell engineering drawing drawn by Kula.  However, that drawing was one of the Heil drawings directly copied by Kula.  The email shows communications by Davis with this third party regarding what appears to be a request to manufacture a trailer part for Troxell.

31.     Also, while still working for Heil, Davis had visited Troxell prior to November 2011.

32.     Kula and Davis both assisted Troxell in competing against Heil while they were still employed by Heil.

33.     With the Liquid Trailer Plans, Troxell was able to—and did—manufacture virtually identical versions of those three specific models manufactured by Heil.  And, Troxell's

fledgling crude oil trailer product line was transformed into a formidable manufacturer of trailers.

34.    With the Liquid Trailer Plans, Troxell is also able to manufacture virtually identical versions of the component parts in, at least, those three specific models.  And, Troxell is able to use Heil's trade secrets to have third parties manufacture those component parts.

35.    Heil's base price for a basic version of even one of those trailers is in excess of $50,000.

36.    In essence, Troxell, via Kula and Davis, has taken the Liquid Trailer Plans and used them to make Heil's own product to compete against Heil.  This includes Troxell even going so far as to put its own name on copies of Heil's engineering drawings/prints where the Heil logo was located.

37.    Due at least in part to the potentially volatile and hazardous nature of some of the transported materials, certain trailers manufactured by Heil and its competitors are regulated by the United States Department of Transportation ("USDOT").  Those trailers are known as 'code tanks.'

38.    The design for 'code tanks' requires certification from a qualified 'design certifying engineer' ("DCE").

39.    Aluminum liquid crude oil trailers are 'code tanks' and are among those trailers that require such a certification.

40.    In fact, at least one of the manipulated Heil drawings with the 'Troxell' name on it that Kula sent from his Heil email account lists Kula as the DCE.

41.    Troxell also recently contacted Heil's software supplier, METAsystems, which wrote custom code for Heil's MRP system.

42.   Upon information and belief, Troxell is now planning to begin manufacturing dry bulk trailers by utilizing trade secret information obtained from Heil.

FURTHER AFFIANT SAYS NOT

_____
Bryan Yielding

Subscribed and sworn to before me, this ___7___ day of ___JUNE_____, 2012.

_____
Notary Public

My commission expires:

___11-23-15___

2647075v1

9                                                    **APP 024**